IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

## DARRELL JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 1004679       Glenn I. Wright, Judge**

**No. W2015-02339-CCA-R3-PC  -  Filed July 19, 2016**

A Shelby County jury found the Petitioner, Darrell Johnson, guilty of three counts of facilitation of attempted aggravated robbery and two counts of facilitation of aggravated burglary.  The trial court sentenced the Petitioner as a Career Offender and imposed a total effective sentence of twenty-four years of incarceration.  This Court affirmed the Petitioner's convictions and sentence.  *State v. Darrell Johnson*, No. W2012-01467-CCA-R3-CD, 2013 WL 5522220, at *1 (Tenn. Crim. App., at Jackson, Oct. 3, 2013), *perm. app. denied* (Tenn. Feb. 12, 2014).  The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing.  On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition.  He contends that he received the ineffective assistance of counsel on appeal.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Darrell Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Austin Scofield, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

#### A. Trial

This case originates from a robbery that occurred in Memphis, Tennessee. Based on this incident, a Shelby County grand jury indicted the Petitioner for three counts of attempted aggravated robbery, two alternative counts of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony. On direct appeal, this Court summarized the underlying facts of the case as follows:

Felimon Martinez and Jose Martinez, both of whom testified through an interpreter, offered substantially similar testimony about the events of December 2, 2009. On that date, the Martinez brothers were settling into their new home on Guernsey, where they had moved the prior day, with their friend, Romero Herberto, and a minor friend, K.O. Felimon Martinez and K.O. were standing near the front window of the house arranging furniture when a black man knocked on the window. Felimon Martinez recognized the man, having seen him at the house next door. The man told Felimon Martinez to open the front door, and he complied. The black man, identified by the Martinez brothers at trial as the [Petitioner], and another black man entered the house. The [Petitioner] asked Felimon Martinez how many people were in the house, explaining that he wanted to "chat" with them. K.O. went to Jose Martinez's bedroom, where he was watching television, and told him to come to the living room. Once everyone was in the living room, the [Petitioner] told them all to sit down. The [Petitioner] then asked how much they were paying in rent, as well as other questions which the Martinez brothers did not understand. At that point, K.O. informed the [Petitioner] and his accomplice that Messrs. Martinez and Mr. Herberto did not speak English. The [Petitioner] and his friend laughed and left the house. Both of the Martinez brothers confirmed that the [Petitioner] asked all of the questions.

Felimon Martinez closed the door, and two to three minutes later, someone knocked. When Felimon Martinez opened the door, the man who had previously accompanied the [Petitioner], later identified as Jermane Greer, put a gun to Felimon Martinez's head and forced him inside toward a closed door off the hallway. Once they approached the door, Mr. Greer ran out of the house. Felimon Martinez testified that he thought Mr. Greer had seen the cellular telephone in Felimon Martinez's hand.

Jose Martinez testified that, while Mr. Greer was in their house, the [Petitioner] waited for Mr. Greer in front of the house next door. When Mr. Greer ran out of the Martinez's house, he stopped at the house next door

2

and gave the handgun to the [Petitioner]. Jose Martinez identified Mr. Greer as the gunman at trial, referring to the same photographic lineup wherein he had previously identified Mr. Greer for police detectives.

On cross-examination, Felimon Martinez testified that the [Petitioner] did not hold him at gunpoint and that he had never seen the [Petitioner] with a gun. Felimon Martinez stated that the [Petitioner] only entered his house one time and that, on that one occasion, he did not invite the [Petitioner] into his home; rather, Mr. Martinez opened the door and the [Petitioner] stepped inside. Jose Martinez testified that the [Petitioner] never brought a gun to his house. Both Felimon and Jose Martinez admitted that the [Petitioner] had never threatened them.

Jose Martinez estimated that his house was approximately 40 to 50 feet away from the [Petitioner's] house. When he saw Mr. Greer give the handgun to the [Petitioner], he watched the [Petitioner] hide the handgun inside the back of his pants. The [Petitioner] and Mr. Greer returned to the house a third time and knocked on the door, but Mr. Martinez did not open the door.

K.O. testified that she was 11 years of age on December 2. She had just returned home from school when two men knocked on the front door. Felimon Martinez opened the door, and the two men stepped inside. K.O. thought the men seemed friendly. One of the men told her to gather everyone in the living room, and she complied. The same man asked how much they paid in rent and if they spoke English. When K.O. responded that the men in the house did not speak English, the two visitors laughed and left the house. Approximately one minute later, there was a knock at the door, and Felimon Martinez and Mr. Herberto instructed her to go to the other room. K .O. and Mr. Herberto went inside the other room, and K.O. locked the door. K.O. hid inside a closet, and Mr. Herberto hid underneath the bed. She testified that she could hear voices outside, although she could not discern exactly what was being said. She knew, however, that "it was like a threat—like 'If you don't open your door, I will shoot['] or something like that." After the intruder left, she called the police. K.O. testified that the two men returned to the house and knocked on the door, but the Martinez brothers refused to open it. K.O. was unable to identify either of the men who came to her house on December 2.

Officer Michael Branning of the Memphis Police Department ("MPD") testified that he was on patrol on December 2 when he received a

call about a robbery at 3740 Guernsey. He arrived at the address within two minutes of the call and, upon speaking with the occupants of the house, immediately detected a language barrier. He called for a Spanish-speaking officer to assist him. While he and the occupants of the house were standing outside, one of the men pointed and exclaimed something to the effect of, "That's him." Officer Branning turned to see a man walking in their direction. Officer Branning and his partner approached the man, who told the officers that he lived in the house next door and that he had just returned home. Officer Branning explained that there had been an incident at 3740 Guernsey and that the man needed to wait in the police cruiser until they could ascertain what had transpired. At trial, Officer Branning identified the [Petitioner] as the man he had detained. Officer Branning testified that someone on the scene pointed to an object on the ground outside the Martinez's house, and Officer Branning saw a pistol magazine lying in the leaves.

MPD Officer Hope Smith testified that she was called to the crime scene to photograph the magazine. She admitted that no fingerprints were collected from the magazine, noting that, at the time it was collected, the magazine was wet because it had been raining. She stated that the investigator would determine whether to process the magazine for fingerprints, and she did not recall who investigated this case.

Jermane Greer testified that he was, at the time of trial, incarcerated on charges of aggravated burglary and attempted aggravated robbery. He stated that he committed those crimes with the help of "Polo" and "Shawn." Mr. Greer identified the [Petitioner] as the man he knew as "Polo" and testified that he knew the [Petitioner] through "Shawn," although he did not know Shawn's real name. Mr. Greer testified that he was 18 years old in December 2009 and that he had received a "special ed diploma" from high school because he had been "in resource ever since [he] was little."

On December 2, Mr. Greer was at his residence when the [Petitioner] and Shawn picked him up. The three men went to the [Petitioner's] house on Guernsey. When they arrived at the house, the men drank beer together and "smoked like half a blunt together." During this time, the [Petitioner] and Shawn began discussing "the Mexican" who lived next door to the [Petitioner] and stated that they wanted to rob him. Mr. Greer did not recall whether it was the [Petitioner] or Shawn who presented the idea of the robbery. Mr. Greer agreed to assist them, and he accompanied the [Petitioner] to the Martinez residence. Shawn was

stationed on the front porch of the [Petitioner's] house as their "lookout."

The [Petitioner] knocked on the door of the Martinez house and "the Mexican" invited them, in Spanish, to come inside. Once inside, the [Petitioner] began asking questions while Mr. Greer looked around the house to determine how many people were present. Something was said about yard work, at which point the [Petitioner] and Mr. Greer began to laugh and left the house. Mr. Greer and the [Petitioner] stood in the yard outside the Martinez's house, and a few minutes later, the defendant handed Mr. Greer a handgun, asking him if he was ready. Mr. Greer responded in the affirmative, and he returned to the front door of the Martinez house. Mr. Greer knocked on the door, believing that the [Petitioner] was going to accompany him inside the house. Felimon Martinez opened the door. Mr. Greer entered the house and pointed a gun at Felimon Martinez, demanding money. Mr. Greer testified that he did not realize he was committing the crime alone until he turned back to discover that the [Petitioner] was not behind him. Mr. Greer forced Felimon Martinez "to one of the rooms where the other Mexican had ran to," instructing Felimon Martinez to make his friend "come out and give me the money" or Mr. Greer would "blow his head off." Mr. Greer testified that, at that point, he heard "like a gun racket noise inside the room," prompting him to flee from the house. Mr. Greer claimed that he ran past the [Petitioner's] house, threw the handgun in the yard, and went home.

Mr. Greer stated that he attempted the robbery because he "was broke" and needed money to buy food. He testified that the plan was to split the money among the [Petitioner], Shawn, and himself, although he admitted that he received nothing from the attempted robbery. With respect to the handgun, Mr. Greer testified that he believed it belonged to the [Petitioner] because the [Petitioner] had given it to him. Mr. Greer stated that he did not have the handgun in his possession when he entered the Martinez's house the first time. He knew, however, that the [Petitioner] was in possession of the handgun during their initial visit to the house because the [Petitioner] had shown the gun to Mr. Greer when they "first got in the car" that day. Mr. Greer identified the [Petitioner] to MPD detectives, explaining that he had known the [Petitioner] previously because they "used to smoke and drink together."

On cross-examination, Mr. Greer admitted that, when he was first brought in for questioning, he lied to law enforcement officers about his involvement in the crimes, although he later told the truth. Mr. Greer

5

acknowledged that the [Petitioner] "didn't pull a gun on anybody," nor did the [Petitioner] steal any property or threaten to kill anyone. Mr. Greer described the handgun as "all black" and stated that he thought it "was a nine." He testified that he threw "the whole gun" into the [Petitioner's] yard, and he denied that he gave the handgun to the [Petitioner].

Mr. Greer denied that he had been promised any leniency in exchange for his testimony. He expressed remorse for his actions and denied that he had ever committed similar crimes. When asked how the [Petitioner] and Shawn were able to convince him to commit these crimes, Mr. Greer responded that "when you kick it with somebody," which he defined as drinking and "smoking weed," and "they want you to do something," then "you just go do it."

On redirect examination, Mr. Greer confirmed that the account of the crimes that he gave to police when he confessed was the same account he had relayed in his trial testimony. He also testified that the initial plan was to commit the robbery during the first visit to the Martinez's home but that, once they realized the language barrier hindered their plans, they left the house to regroup. While Mr. Greer and the [Petitioner] stood in the front yard, they developed a new plan, which included the [Petitioner's] accompanying Mr. Greer into the house, and the [Petitioner] handed the gun to Mr. Greer.

Based on this evidence, the jury convicted the [Petitioner] of the lesser offenses of facilitation of attempted aggravated robbery and facilitation of aggravated burglary. The jury acquitted the [Petitioner] of the charge of employing a firearm during the commission of a dangerous felony.

*Johnson*, 2013 WL 5522220, at *1-4 (footnotes omitted). The trial court found the Petitioner to be a Career Offender and imposed mandatory sentences of twelve years for each of the five Class D felony convictions. The trial court ordered two of the facilitation of attempted aggravated robbery convictions to be served consecutively, with the other three convictions to be served concurrently. As such, the trial court ordered an effective sentence of twenty-four years of incarceration. *Id.* at *4.

### B. Post-Conviction Hearing

On July 9, 2014, the Petitioner filed *pro se* a petition for post-conviction relief on multiple grounds, including that he had received the ineffective assistance of counsel. On

February 10, 2015, with the assistance of an attorney, the Petitioner filed a supplementary brief in support of the petition, alleging that he had received the ineffective assistance of counsel when trial counsel ("Counsel") failed to file the full record on appeal with the clerk, specifically a transcript of the sentencing hearing, thereby denying the Petitioner the opportunity to have his sentence reviewed.

On June 4, 2015, the post-conviction court held a hearing during which the parties presented the following evidence: Counsel testified that he had practiced law since 1984, mostly in the areas of criminal law and bankruptcy. He agreed that he represented the Petitioner at his trial and recalled that he was retained by the Petitioner because he had represented him once before. Counsel stated that the Petitioner's was a "very serious case" and that the facts showed that the Petitioner and his co-defendant went to the victims' house to see what property they had inside their home before returning with a gun and attempting a robbery. Counsel recalled that the State made a plea offer of six years but that the Petitioner elected to proceed to trial. Counsel recalled that the co-defendant testified in the Petitioner's trial and that the Petitioner was convicted as a participant in the crime under the theory of facilitation.

Counsel testified that the sentencing process was "peculiar" because the hearing was reset at least six times, mostly at the request of the trial court. The presentence report showed that the Petitioner had an extensive criminal history, and the trial court stated that it was one of the worst criminal records it had ever seen. Counsel "got the impression" that the trial court wanted Counsel and the State to reach an agreement on the Petitioner's sentence because of the Petitioner's complicated criminal history, but the State insisted on a lengthy sentence because of the Petitioner's prior record. No agreement was reached. Counsel recalled that, during the sentencing hearing, the Petitioner's family testified that they wanted to help him turn his life around. Otherwise, the Petitioner's criminal record was the "primary inquiry" on the length of his sentence.

Counsel agreed that he handled the Petitioner's appeal. He stated that it was "probably" unfair that the Petitioner's co-defendant served less time in jail for testifying at trial. Counsel recalled that the trial court, when sentencing the Petitioner, considered the sentencing factors and placed significant weight on the Petitioner's record. Counsel testified that the Petitioner's family, including his brother, spoke to the trial court at one of the earlier sentencing dates. When Counsel filed the Petitioner's appeal, the transcript of the conversation between the trial court and the family was not included in the record.

On cross-examination, Counsel stated that the conversation between the trial court and the family at the earlier sentencing date did not amount to evidence being presented but gave the trial court some background information. At no time until the final sentencing hearing did the trial court make a ruling on sentencing or make any findings.

Thus, when filing the appeal, Counsel included the transcript from the day of sentencing only. As for the transcript from the other days when the sentence was discussed with the trial court, Counsel testified that he did not think it was germane as to any of the sentencing factors. Those discussions, Counsel felt, were simply the trial court acknowledging the Petitioner's family and their presence at the scheduled court date.

The post-conviction court issued an order denying the petition:

> In summary, although the incomplete record of the sentencing hearing forced the Court of Appeals to assume the correctness of the consecutive sentencing of the Petitioner, the complete record would not have changed the outcome of the Petitioner's appeal. The complete record would have allowed the Court of Appeals to either review the sentencing or remand the issue and either decision[ ] would have resulted in an affirmation of the consecutive sentencing of the Petitioner based on his extensive criminal record.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel because Counsel failed to file a portion of the sentencing transcript. The State responds that the Petitioner received the effective assistance of counsel at trial. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. §40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth

Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim.

App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

As with trial counsel, the right to representation of appellate counsel also "necessarily includes the right to effective assistance of counsel." *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). The same principles apply in determining effective assistance of both trial and appellate counsel, and a petitioner must show both deficient performance and prejudice. *Id.* That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Id.* at 597.

In the present case, the post-conviction court found that Counsel's failure to file a portion of the transcript from the sentencing hearing, detailing the trial court's conversation with the Petitioner's family, did not affect this Court's appellate review of the Petitioner's sentence, given his extensive criminal history. We conclude that the post-conviction court's decision that Counsel was not ineffective was supported by the evidence. Counsel testified that the trial court made its decision with regard to the Petitioner's sentence primarily based on the Petitioner's criminal record, which the trial court noted was one of the most extensive it had ever seen. Counsel stated that the trial court's discussion with the Petitioner's family was not part of the sentencing decision and thus Counsel did not think it would be relevant on appeal. The Petitioner has not shown that, had Counsel filed the transcript, this Court's decision on appeal with regard to the Petitioner's sentence would have been different. Thus, we conclude that the Petitioner failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to prove the first prong of the *Strickland* standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id.*

## III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE